**NEUROLOGICAL RESOURCES, P.C., Plaintiff,**

v.

**ANTHEM INSURANCE COMPANIES d/b/a Blue Cross/Blue Shield, Defendant.**

**No. IP 97–1158–C H/G.**

United States District Court, S.D. Indiana, Indianapolis Division.

Aug. 17, 1999.

842

Robert G. Zeigler, Zeigler Carter Cohen & Koch, Indianapolis, IN, for plaintiff.

Thomas G. Stayton, Baker & Daniels, Indianapolis, IN,Joseph F. Pieters, Anthem, Inc., Indianapolis, IN, for defendant.

HAMILTON, District Judge.

This action presents important and recurring questions about the standards that courts apply when reviewing decisions to deny benefits under employee benefit plans governed by the federal Employees Retirement Income Security Act (ERISA). The issues are whether standard terms in group health insurance plans that do not explicitly grant discretionary power to a plan administrator to construe ambiguous terms or to determine eligibility for benefits nevertheless satisfy the standards established in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), for applying a deferential "arbitrary and capricious" standard of review. As explained below, the court concludes that plan provisions requiring proof of claims, excluding coverage for services that are not "medically necessary," and excluding coverage for experimental treatments do not, without more, confer discretionary authority on plan administrators. The court therefore subjects the denials of benefits under such plans to *de novo* review. The court also addresses other issues concerning antiassignment clauses under ERISA and under Indiana law, as well as claims under Indiana law for bad faith denial of insurance coverage.

Plaintiff Neurological Resources, P.C. and defendant Anthem Insurance Companies have been engaged in a long-term dispute over whether Anthem should pay Neurological Resources for various chiropractic treatments and diagnostic practices that it provides to patients who are beneficiaries of Anthem group health insurance policies. Anthem is suspicious of the care Neurological Resources provides to patients. Anthem has "flagged" Neurological Resources so that claims for payment for its services to Anthem's insureds apparently receive special (and skeptical) treatment from Anthem. At the core of the dispute there appears to be a serious disagreement about whether at least certain of Neurological Resources' chiroprac-

tic treatments and diagnostic practices are at all effective or medically legitimate.

In this lawsuit, Neurological Resources has sued Anthem on health insurance claims totaling $224,794. The logistical challenge lies in the fact that the total amount covers 91 separate claims on behalf of 60 individuals who were insured under 16 different health insurance policies, some governed by the federal Employees Retirement Income Security Act (ERISA), while others are governed instead by Indiana law. Anthem has refused to pay the claims, stating in most instances that the services were not shown to have been medically necessary, and in a few cases that the services were for experimental or investigational services. Neurological Resources obtained from the insureds assignments of their rights under the policies and then sued Anthem in state court. Anthem removed to this court on the basis of ERISA preemption.[1]

Anthem has moved for summary judgment on all claims. The motion for summary judgment does not directly confront the merits of the parties' central dispute— whether the services Neurological Resources provides are actually "medically necessary" or are otherwise effective in treating real health problems. The motion instead avoids that central dispute and raises a number of other issues. As explained below, Anthem is entitled to summary judgment on those claims arising under health insurance plans that prohibit or restrict beneficiaries from assigning their rights to a health care provider. Anthem is also entitled summary judgment on the claims that are not governed by ERISA, as well as on one claim involving treatment for a work-related injury.

Anthem has also argued that its denials of virtually all ERISA claims are subject to the "arbitrary and capricious" standard of review. As explained below, the court disagrees on all but one of the plans in question, for only that one plan expressly or implicitly grants Anthem discretionary power to interpret plan provisions or to determine eligibility for benefits. Claims arising under the other ERISA plans are subject to *de novo* review. With respect to the tedious but vital task of addressing Anthem's handling of individual patients' claims, Anthem has provided a mass of sketchy and disorganized records tied together by affidavits asserting for most files that Anthem determined the patient's treatment was not medically necessary. Some of the patients' files do not even include a single contemporaneous record identifying the basis for Anthem's claim denials. See, *e.g.,* Def.App. G, Vol. 3, Ex. 46. Several other files do not contain any record of correspondence between Anthem and Neurological Resources. See, *e.g.,* Def.App. G, Vol. 3, Ex. 36.

In this entry, the court explains its rulings on the issues concerning the assignment of claims, the standard of review under ERISA, the issues of Indiana law governing the non-ERISA claims, and the one claim for treatment of a work-related injury. In a separate, even longer, entry being issued today, the court plods through the specifics of the individual patients' files and explains why summary judgment must be denied as to each such claim not resolved by the court's rulings on the broader issues addressed in this entry. In general, the patients' records show that Anthem "flagged" any claim from Neurological Resources for special review. In that special review, Anthem merely recorded its skeptical conclusions and failed to comply with the notice requirements under ERISA when a claim for benefits is denied. See 29 U.S.C. § 1133; *Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 689 (7th Cir.1992). In fact, Anthem decided

---

1. This court has subject matter jurisdiction over all the claims arising from insurance policies governed by ERISA. The claims arising from insurance policies not governed by ERISA are within this court's supplemental jurisdiction under 28 U.S.C. § 1367(a). The record before this court does not definitively preclude the possibility that diversity jurisdiction might also be present here, but the court is not relying on diversity jurisdiction.

internally that it would provide the further information required by ERISA only if Neurological Resources appealed the denial of the claims.

### Procedural Background

Plaintiff Neurological Resources, P.C. is a Pennsylvania professional corporation that also does business in Indiana. Defendant Anthem Insurance Companies is a mutual insurance company registered under Indiana law with its principal place of business in Indiana. On June 16, 1997, Neurological Resources filed suit against Anthem in the Marion Superior Court. Count I alleged that Anthem had violated Ind.Code § 27–4–1–4.5 and "normal business custom and practice" by failing to pay Neurological Resources for health care services it had provided to insureds of Anthem. Count I sought damages of $224,794 plus prejudgment interest, attorneys' fees, and costs. Count II alleged that Anthem's refusal to pay had been in bad faith and added a claim for punitive damages.

Anthem removed the action to this court on the ground that Neurological Resources was seeking benefits for medical treatment provided to insurance beneficiaries, "a substantial number of whom were entitled to benefits under Employee Welfare Benefit Plans governed by the Employee Retirement Income Security Act of 1974 (ERISA)."

### Undisputed Facts

Because Anthem has moved for summary judgment, the court considers the evidence in the record in the light reasonably most favorable to the non-moving party, Neurological Resources, giving it the benefit of choices between reasonable interpretations of ambiguous evidence and between competing inferences that might be drawn from the evidence. For purposes of Anthem's motion for summary judgment, the following facts are undisputed or reflect the record evidence in the light reasonably most favorable to plaintiff.

Plaintiff Neurological Resources has provided some form of medical services,

either treatment or diagnostic services, to 60 individuals who are insured under 16 different health insurance policies issued by defendant Anthem. The individuals to whom services were provided all suffered from a variety of back and neck conditions. Anthem denied or "pended" claims for all 60 of these individuals. (When Anthem "pends" a claim, it does not approve payment but defers a decision pending receipt of further information.) Anthem's reasons for not paying the claims in question fall into three categories. First, the greatest number involve claims for services that Anthem determined had not been shown to be "medically necessary." Second, Anthem denied several claims on the basis that the procedures performed by Neurological Resources were investigational and so were excluded under the applicable policies. Third, Anthem denied one claim because the insured had suffered a work-related injury, which was excluded by the policy and left to the worker's compensation system.

■ Nine of the 16 policies in issue here are employee benefit plans governed by ERISA. ERISA preempts state law claims arising under these policies. See *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 60, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 47–48, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Hizer v. General Motors Corp., Allison Gas Turbine Div.*, 888 F.Supp. 1453, 1459 (S.D.Ind. 1995). The parties here agree that the court should treat this case as if Neurological Resources had formally amended its complaint to assert claims under 29 U.S.C. § 1132(a)(1)(B) for denial of benefits for those individuals covered by ERISA plans. The court will do so. Other facts are set forth below and in the separate entry as needed.

### Discussion

I. *Plans with Anti–Assignment Clauses*

■ A number of the Anthem policies (both ERISA and non-ERISA) either ex-

pressly prohibit assignments of claims for benefits or give Anthem the sole discretion to pay health care providers directly. These plans include the Darling Policy, the Hobart Plan, the Kankakee Plan, the National Administrative Contract, the Washington Township Plan, the Porter County Plan, the CEDA Plan, the Slater ASO, and the Vaneck Policy. See Def.App. C at 1–2.[2] Anthem argues under both Indiana law and federal common law that it is entitled to summary judgment on these claims because Neurological Resources has no standing to assert claims on behalf of those insureds who are covered under these policies with anti-assignment provisions.

Relying primarily on *Hermann Hospital v. MEBA Medical and Benefits Plan,* 959 F.2d 569 (5th Cir.1992), Neurological Resources argues that the anti-assignment policy terms in the ERISA plans should not be enforced as a matter of public policy. In *Hermann Hospital,* a hospital had provided care to a plan beneficiary for six months before her death. The beneficiary and her husband had executed an assignment of their rights to payment to the hospital. The hospital eventually sued the plan for payment of benefits. The benefit plan included an anti-assignment clause. The Fifth Circuit held first that the plan was estopped from relying on the anti-assignment clause to deny payment. 959 F.2d at 574. During the six months the beneficiary had been hospitalized, the plan and the hospital had been in "continuous communication" while the hospital was providing the services in question. During that period, the plan never referred to the anti-assignment clause but merely said it was investigating the claim. By continuing to provide services without making

alternative arrangements for payment, the hospital relied to its detriment on the plan's failure to raise any question about the anti-assignment clause. See *id.*

In the alternative, the Fifth Circuit also said, the anti-assignment clause should be interpreted as not applying to health care providers who had provided treatment to a beneficiary. The Fifth Circuit explained: "We interpret the anti-assignment clause as applying only to unrelated, third-party assignees—other than the health care provider of assigned benefits—such as creditors who might attempt to obtain voluntary assignments to cover debts having no nexus with the Plan or its benefits, or even involuntary alienations such as attempting to garnish payments for plan benefits." 959 F.2d at 575. The court reasoned that any other interpretation would be unfair to the hospital or other provider because in most cases, the ability to recover payment would depend on the patient's willingness to file suit against the plan. The patient would have little incentive to pursue such a claim when, as a practical matter, any recovery would be paid to the hospital or other provider. See *id.*

■ Anthem points out, however, that the Seventh Circuit approaches the issue differently by focusing primarily on enforcing the terms of the plan as written, including anti-assignment clauses. "Because ERISA instructs courts to enforce strictly the terms of plans, see 29 U.S.C. § 1104(a)(1)(D) and *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.,* 870 F.2d 1148 (7th Cir.1989) (*en banc*), an assignee cannot *collect* unless he establishes that the assignment comports with the plan."

---

**2.** In this same appendix, Anthem then lists the insureds covered by these policies: Robert Atherton, Cary Christopher, Jeffrey Mullen, Rhonda Mullen, Debra Guy, Deborah Darnell, William Darnell, Dan L. Koishol, Christopher Stutz, Mary Sandlin, Loretta Darling, and Ingrid M. Vaneck. Def.App. C at 2. (Ann Osmolak should also be added to this list, because she was insured under the Washington Town-

ship Plan. Def.App. A at 19.) In an attempt to determine the accuracy of this list, the court attempted to cross-reference Anthem's Appendix C with Anthem's Appendix A, but found that the names of the plans are inconsistent in the two appendices. However, because Neurological Resources did not object to Anthem's Appendix C, the court will treat this summary as accurate.

*Kennedy v. Connecticut General Life Ins. Co.,* 924 F.2d 698, 700 (7th Cir.1991).

This court must follow here the Seventh Circuit's reasoning in *Kennedy* rather than the Fifth Circuit's *dicta* in *Hermann Hospital* concerning policy arguments and equities. If Neurological Resources can sue at all on some of the claims in this case, it is through assignments, and *Kennedy* instructs district courts to allow such claims only where the assignments comply strictly with the terms of the applicable plans.

The approach under Indiana law is the same as the Seventh Circuit's. See *National Fire and Casualty Co. v. West,* 107 F.3d 531, 535 (7th Cir.1997) ("An unambiguous provision in an insurance policy must be enforced, even if it results in a limitation of the insurer's liability."), quoting *Cincinnati Insurance Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 151 (7th Cir.1994); *Stevenson v. Hamilton Mutual Insurance Co.,* 672 N.E.2d 467, 471 (Ind.App.1996) ("An unambiguous policy must be enforced according to its terms, even those which limit the insurer's liability.").

Neurological Resources has not tried to argue that the anti-assignment clauses in the relevant plans do not apply here by their terms. Neurological Resources asserts, however, that Anthem should be deemed to have waived any reliance on the anti-assignment clauses because there is no evidence that Anthem raised this issue during the claims review process. Neurological Resources has not supported the waiver argument with any law or evidence. It also has not shown any detrimental reliance of the sort that was decisive for the Fifth Circuit in *Hermann Hospital.* See 959 F.2d at 574. Accordingly, Anthem is entitled to summary judgment on the claims arising under policies with anti-assignment clauses.

## II. Non–ERISA Claims

■ ERISA does not preempt plaintiff's state law claims arising under insurance policies that are not governed by ERISA. Indiana law governs plaintiff's claims arising under the two individual health insurance policies and five group health plans not covered by ERISA.

Neurological Resources' state law claims run into several obstacles. First, Anthem argues that Neurological Resources may not assert claims for "bad faith" denial of claims because Neurological Resources is not the insured, and because Indiana law does not recognize a private right of action for alleged violations of Ind.Code § 27–4–1–4.5 or for violations of "normal business custom and practice." The court agrees.

The Supreme Court of Indiana recognized the tort of bad faith denial of insurance coverage in *Erie Insurance Co. v. Hickman,* 622 N.E.2d 515, 518–19 (Ind. 1993). *Hickman* involved a suit by the insureds directly against their insurance company. In *Dimitroff v. State Farm Mutual Automobile Insurance Co.,* 647 N.E.2d 339, 342 (Ind.App.1995), the Indiana Court of Appeals considered whether a third party to the insurer-insured relationship could assert a claim for bad faith denial of coverage. As the issues were framed in *Dimitroff,* the issue was whether Dimitroff could sue State Farm for bad faith denial of payment for Dimitroff's claim for personal injuries caused by another driver insured by State Farm.[3] The Court of Appeals declined to extend the holding of *Hickman* to the third party situation. 647 N.E.2d at 342. Similarly here, Neurological Resources was not an insured under any of the policies in question here. The court has no reason to expect that the Supreme Court of Indiana would disagree with *Dimitroff* on this

---

**3.** The issues in *Dimitroff* were slightly complicated by the fact that State Farm was also Dimitroff's insurer. Because the case concerned the insurer's handling of his claim against another of State Farm's insureds, the court of appeals treated him as if he were any other third party asserting a liability claim against an insured. See 647 N.E.2d at 341. No similar complication is present in this case.

point. Count II of the complaint therefore does not state a claim for relief under Indiana law.

 Indiana statutes governing insurance companies identify and prohibit a number of unfair claim settlement practices. See Ind.Code § 27–4–1–4.5. At the same time, however, the legislature specified that it was not creating a new private right of action under the statute. Ind.Code § 27–4–1–18 (limiting cause of action to actions by insurance commissioner to enforce orders and to appeals of commissioner's orders). Plaintiff's allegations that Anthem took actions prohibited by Ind.Code § 27–4–1–4.5 therefore do not state claims for relief under Indiana law. Similarly, in commercial relationships governed by written contracts, plaintiff's allegation that Anthem took action "in violation of normal business custom and practice" also does not state a claim for relief independent of any breach of a controlling contract.

Anthem also argues that the remaining non-ERISA claims, which Neurological Resources refers to as "a valid state law claim and collection action," should be dismissed because Indiana law does not recognize such a theory. The court agrees. Neurological Resources has not cited any law recognizing such an action, let alone articulated what such a claim is or what the elements of this claim might be. The court declines to develop arguments for a party. The court therefore grants Anthem's motion for summary judgment on the remaining state law claims.

### III. *Claim for a Work–Related Injury*

 One claim arising under an ERISA plan can be dealt with quickly. That is the solitary claim for treatment for work-related injuries to Mr. James McKee. The applicable Burns Harbor health insurance policy excluded coverage for work-related injuries. Neurological Resources submitted to Anthem a report that stated: "The patient is a 39 year old male who suffered a work related [injury] in April 1996 injury

[sic] while lifting and pulling." Def.App. G, Vol. 2, Ex. 34 at Bates No. A 000778. Neurological Resources has offered no evidence that would raise a genuine issue of material fact on this point. Anthem is entitled to summary judgment on the claim for treating Mr. McKee.

### IV. *Claims Rejected for Treatment Deemed "Not Medically Necessary," "Investigational," or "Experimental"*

 The principal dispute here concerns claims for payments that Anthem denied on the ground that the procedures were not "medically necessary" or were "investigational" or "experimental." Because several different plans, individuals, and treatments are at issue, the court must examine these claims on a case-by-case basis. First, however, the court must determine which standard of review applies to each of these plans.

 The controlling principles are set forth in *Firestone Tire & Rubber Co. v. Bruch,* where the Supreme Court applied (or adapted) principles of trust law to ERISA claims and held that "a denial of benefits ... is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Thus, *Firestone* established a presumption that benefit determinations are reviewed *de novo,* but recognized an exception to this presumption only where a plan includes language that sets forth an affirmative grant of discretionary authority. If the plan documents give the trustees or plan administrator discretionary authority on a relevant matter, the court subjects the benefit decision to review under a more deferential "arbitrary and capricious" standard. *E.g., Trombetta v. Cragin Federal Bank for Savings Employee Stock Ownership Plan,* 102 F.3d 1435, 1437 (7th Cir.1996), citing *Firestone.*

The Seventh Circuit has extended the *Firestone* exception so that plan language such as "all proof must be satisfactory to us" is sufficient to confer discretion on an administrator in evaluating such proof. For instance, in *Donato v. Metropolitan Life Insurance Co.*, 19 F.3d 375, 379–80 (7th Cir.1994), the court held that the arbitrary and capricious standard of review applied where the plan stated that benefits would be paid "Upon receipt of proof," that all proof "must be satisfactory to us," and that the description of the event and the cause of a claim must also be "satisfactory to us." Similarly, in *Bali v. Blue Cross & Blue Shield Ass'n*, 873 F.2d 1043, 1047–48 (7th Cir.1989), the court concluded that the arbitrary and capricious standard of review applied to a plan's decision that the claimant failed to submit sufficient medical evidence to support the claim. The plan stated that disability would be determined "on the basis of medical evidence satisfactory to the Committee."

On this point, *Donato* and *Bali* are at the edge of a sharp split among the circuits as they try to apply *Firestone*. Most recently, in *Kinstler v. First Reliance Standard Life Insurance Co.*, 181 F.3d 243 (2d Cir.1999), a panel of the Second Circuit reviewed the circuits' different conclusions as to whether plan language calling for "satisfactory proof" or words to that effect satisfies the *Firestone* exception for explicit grants of discretionary authority. Judge Newman noted that recent *en banc* decisions of the Ninth and Sixth Circuits had reached opposite conclusions. 181 F.3d at 251. In *Kearney v. Standard Insurance Co.*, 175 F.3d 1084, 1089–90 (9th Cir.1999) (*en banc*), the Ninth Circuit held (on a vote of 8 to 3) that a plan's requirement of "satisfactory written proof" of disability was not sufficient to confer discretionary power under *Firestone*. In *Perez v. Aetna Life Insurance Co.*, 150 F.3d 550, 557 (6th Cir.1998) (*en banc*), the Sixth Circuit held (on a vote of 8 to 6) that a disability plan term giving the administrator "the right to require as part of the proof of claim satisfactory evidence ... that [the claimant]

has furnished all required proofs for such benefits" was sufficient to confer discretionary power under *Firestone*.

Keeping in mind the presumption in *Firestone* that review is *de novo* absent clear provisions granting discretionary power, the Second Circuit observed in *Kinstler*:

> Every plan that is administered requires submission of proof that will "satisfy" the administrator. No plan provides benefits when the administrator thinks that benefits should not be paid! Thus, saying that proof must be satisfactory "to the administrator" merely states the obvious point that the administrator is the decision-maker, at least in the first instance. Though we reiterate that no one word or phrase must always be used to confer discretionary authority, the administrator's burden to demonstrate insulation from *de novo* review requires either language stating that the award of benefits is within the discretion of the plan administrator or language that is plainly the functional equivalent of such wording. *Since clear language can be readily drafted and included in policies, even in the context of collectively bargained benefit plans when the parties really intend to subject claim denials to judicial review under a deferential standard, courts should require clear language and decline to search in semantic swamps for arguable grants of discretion.*

181 F.3d at 252 (emphasis added).

Anthem contends that its decisions to deny benefits to the insureds in this case should be reviewed under the deferential arbitrary and capricious standard. Anthem makes three arguments: (1) its insureds were "required to submit proof in support of their claims, which also gives Anthem discretion to weigh the 'proof;'" (2) Anthem had "discretion to determine whether supplies, services and care are 'medically necessary' and, therefore, whether ... claims are covered under the

ERISA plans;" and (3) "in several instances, Anthem had discretion to determine whether to pay benefits for services and supplies not specifically identified in the ERISA plan." Def. Br. at 20.

Anthem cites a number of cases to support its argument that a requirement that an insured submit proof in support of a claim implies that the administrator has the discretion to determine a claimant's eligibility. In *Patterson v. Caterpillar, Inc.*, 70 F.3d 503, 505 (7th Cir.1995), the court applied the arbitrary and capricious standard where the relevant plan language provided that "benefits will be payable only upon receipt ... of such notice and such due proof ... of such disability." Citing *Donato* and *Bali*, the court stated: "This language is similar to provisions that we previously have held sufficient to apply the arbitrary and capricious standard of review." *Id.* The court offered no further explanation on the point.

Anthem also relies on *Bollenbacher v. Helena Chemical Co.*, 926 F.Supp. 781, 786 (N.D.Ind.1996), which took *Patterson* a step further. In *Bollenbacher*, the district court applied the arbitrary and capricious standard of review where the plan stated that benefits would be paid when "the Company receives proof that the individual is disabled due to sickness or injury and requires the regular attendance of a physician." 926 F.Supp. at 786. The court asserted that such language "implicitly grants to the administrator the discretion to determine eligibility under the plan based on the administrator's assessment of that proof." *Id.* at 787. Relying on *Donato* and what it perceived to be the Seventh Circuit's "even more liberal standard" adopted in *Patterson*, the court noted: "As a practical matter, it is difficult to detect a qualitative difference between plan language that requires a claimant to submit 'proof' and one that requires the submission of 'such due proof' or even 'satisfacto-

ry proof.' Indeed, adjectives like 'satisfactory' seem rather redundant when teamed with the concept of 'proof.'" *Id.* at 786–87.

The court is not persuaded by Anthem's argument. First, if Anthem's interpretation of *Patterson* were correct—in other words, if merely requiring proof of a claim were enough to confer discretionary authority on a plan administrator—then *Patterson* could not be reconciled with *Firestone*, the controlling Supreme Court precedent.

*Any* plan must give *some* administrator *some* power to require proof of a claim, to evaluate that proof, and to decide whether the claim should be paid, if for no other reason than to avoid fraudulent claims. If those elements of a plan were enough to justify deferential review under the arbitrary and capricious standard, that result would effectively reverse the Supreme Court's presumption in *Firestone* that benefit denials be reviewed under a *de novo* standard. If the court were to follow the reasoning advanced by Anthem and set forth in *Bollenbacher*, a benefit determination would be subject to *de novo* review only if the plan explicitly disclaimed discretionary power (or perhaps if the plan provided that claims would simply be paid on demand).[4] Reasonable policy arguments can be advanced to support both the *de novo* standard and the arbitrary and capricious standard, as well as other variations. This court's role, however, is to apply the controlling principles set forth by the Supreme Court in *Firestone*, which established a clear presumption in favor of *de novo* review.

Employee benefit plans are ultimately contracts and are often the subject of collective bargaining, as in this case. The standard of review—*i.e.*, the extent of the plan administrator's discretion to deny benefits to employees and their families—

---

4. The court assumes that the latter type of plans would not stay solvent long enough to become involved in litigation.

can be a subject of collective bargaining. If the courts were to deem language merely requiring "proof" of a claim as sufficient to confer discretion on an administrator, it would appear that the only way for negotiators to assure *de novo* review would be to include language explicitly disclaiming discretionary power. That approach would effectively reverse the presumption adopted by the Supreme Court in *Firestone*. Parties and their lawyers who draft ERISA plans are entitled to clear guidance on the often critical question of the standard of review. It is easy to write explicit language satisfying the *Firestone* exception for grants of discretionary power. Searching for implicit grants of such authority creates a serious risk that courts, and parties, will get lost in what the Second Circuit accurately described as "semantic swamps" in this debate. See *Kinstler*, 181 F.3d at 252.

*Firestone* clearly held that benefit denial decisions are subject to *de novo* review unless there are contrary provisions in the plan. Anthem's interpretation of *Patterson* would significantly extend the reasoning of other Seventh Circuit cases, such as *Donato* and *Bali*, to the point that would create, in this court's view, a direct conflict

with *Firestone*. Although it is difficult to determine the precise basis for the Seventh Circuit's determination in *Patterson* that the arbitrary and capricious standard applied to the plan at issue, the court must not have intended to produce a result inconsistent with *Firestone*. For these same reasons, the court declines to follow the reasoning in *Bollenbacher*.

The circuits are debating whether the approach set forth in *Donato* and *Bali* is consistent with the presumption set forth in *Firestone*. As a district court in the Seventh Circuit, this court has no direct role in that debate.[5] But extending the approach in *Donato* and *Bali* to the language in this plan, which requires merely proof of a claim, would effectively conflict with *Firestone*, which this court is bound to follow. Accordingly, this court holds that plan language merely requiring proof of a claim, without additional language implying a right to exercise *discretionary* judgment, is not enough to show that the administrator has discretion such that the arbitrary and capricious standard of review should apply.

To determine whether Anthem was exercising discretionary powers under the

---

**5.** The strongest basis for reconciling *Donato* and *Bali* with *Firestone* on this point might be the role of "satisfaction" in contract law. Where a contract gives one party the right to determine whether the other party's performance is "satisfactory," regardless of whether an objective, reasonable person standard or merely a subjective, good faith standard is applied, it is generally clear that some considerable degree of discretion may be exercised in determining whether performance is satisfactory. See, *e.g.*, *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1186–87 (7th Cir.1996) (applying Illinois law and distinguishing between objective and subjective satisfaction); *Morin Building Products Co. v. Baystone Construction, Inc.*, 717 F.2d 413, 415 (7th Cir. 1983) (applying Indiana law and distinguishing between reasonable person and good faith standards); *Willig v. Dowell*, 625 N.E.2d 476, 482 (Ind.App.1993) (same), *vacated in part on other grounds*, 627 N.E.2d 1365 (Ind.App. 1994). This backdrop of general contract law (which is highly relevant in ERISA cases, see, *e.g.*, *Thomason v. Aetna Life Insurance Co.*, 9

F.3d 645, 647 (7th Cir.1993) (courts are to develop federal common law under ERISA)), provides some support for the view that a benefit plan requiring that proof be "satisfactory" to the plan administrator effectively delegates discretionary power.

The Second Circuit in *Kinstler* and Judge Lee in *Bollenbacher* both expressed the view that the term "satisfactory" adds little to a requirement of proof of a claim, although the two courts reached opposite conclusions about the applicable standard of review. See *Kinstler*, 181 F.3d at 252; *Bollenbacher*, 926 F.Supp. at 786–87. Those views also have a great deal of common sense appeal. In light of the views stated persuasively in those opinions, it appears to this court that the only way to make the term "satisfactory" carry decisive weight on the standard of review would be to emphasize the concept of satisfaction from contract law. In view of the circuit split that has been crystallizing, however, the importance of the word "satisfactory" in this context is a question that appears to be headed toward the Supreme Court.

more specific terms of the plans, the court now considers the language in each of the ERISA plans at issue.

**■** *The Bethlehem Steel Plan:* Anthem cites three provisions in the Bethlehem Steel Plan to support its argument that this plan gives the plan administrator discretionary authority to determine eligibility:

Under the Social Insurance Plan, *the Plan Administrator has the responsibility to interpret and construe the provisions of the Plan, to determine eligibility to participate in the Plan,* to make and enforce such rules and regulations as the Plan Administrator shall deem necessary and proper for the efficient administration of the Plan, and to decide such questions as may arise in connection with the operation of the Plan, subject to Section 11 of the Program of Insurance Benefits.

\* \* \*

**Covered Medical Expenses**

The term "Covered Medical Expenses" means the reasonable and customary charges, as determined by Blue Cross or Blue Shield, incurred by you or one of your dependents for the following types of medical services, supplies and treatments which are performed or prescribed as necessary by (i) a licensed physician, or (ii) a licensed podiatrist with respect to the services of a podiatrist for which benefits are payable under the Program.

\* \* \*

**Medical Necessity**

Health Care Benefits under the Program are payable only if the services rendered are medically necessary.

MEDICALLY NECESSARY means that the services and supplies in question are medically reasonable and necessary for the diagnosis or treatment of an illness or accidental injury and are given at the appropriate level of care. The fact that a procedure or level of care is prescribed by a physician does not mean that it is medically reasonable or necessary. In determining questions of reasonableness and necessity, due consideration shall be given to the customary practices of physicians in the community where the service is performed. Services which are not reasonable and necessary shall include, but are not limited to the following:

(1) procedures which are experimental or of unproven or questionable current usefulness;

(2) procedures which tend to be redundant when performed in combination with other procedures;

(3) diagnostic procedures which are unlikely to provide a physician with additional information when they are used repeatedly;

(4) procedures which are not ordered by a physician or which are not documented in a timely fashion in the patient's medical record; and

(5) procedures performed in an inpatient setting which could be performed with equal safety and effectiveness in an outpatient setting or treatment which can be performed with equal efficiency and quality at a lower level of care.

Def.App. F., Bush Decl. Ex. A at 2, 36, 60–61 (emphasis added).

In arguing that these provisions do not confer discretion on the administrator, Neurological Resources states only that these excerpts contain "broad language granting authority to the administrator, but the Plaintiff would contend that in reference to the specific, relevant portions of the plan, (especially those terms and provisions specifically cited by the Defendant as the basis for the denial of benefits, such as the definition of the term 'medically necessary') there *is no express language conveying discretion to the administrator.*" Pl. Br. at 18–19.

The Seventh Circuit has squarely rejected Neurological Resources' argument that a plan's language must contain an *explicit* grant of discretionary authority in order to apply the arbitrary and capricious standard of review. No specific magic words are required. *Donato,* 19 F.3d at 379, citing *Sisters of Third Order of St. Francis v. SwedishAmerican Group Health Benefit Trust,* 901 F.2d 1369, 1371 (7th Cir.1990). The Bethlehem Steel Plan's provision that "the Plan Administrator has the responsibility to interpret and construe the provisions of the Plan" and "to determine eligibility to participate in the Plan," see Def. App. F., Bush Decl. Ex. A at 2, is very close to the language that *Firestone* recognized would be sufficient to confer such discretion on the administrator, and virtually identical to language the Seventh Circuit has held sufficient. See *Firestone,* 489 U.S. at 115, 109 S.Ct. 948 (*de novo* standard applies unless plan gives administrator "discretionary authority to determine eligibility for benefits or to *construe the terms of the plan* ") (emphasis added); *Chojnacki v. Georgia–Pacific Corp.,* 108 F.3d 810, 814–15 (7th Cir.1997) (concluding that deferential review should apply where plan language asserted that administrator is "responsible for interpreting provisions of this Plan"); see also *Gallo v. Amoco Corp.,* 102 F.3d 918, 921 (7th Cir.1996) (concluding that decisions of administrator who possessed the "discretion to interpret" a plan were entitled to deferential review). Accordingly, the court will apply the arbitrary and capricious standard of review to the administrator's decisions under the Bethlehem Steel Plan.

■ *The Burns Harbor Plan:* Anthem cites the following provisions in the Burns Harbor Plan to support its argument that this plan gives the plan administrator discretionary authority to determine eligibility:

**The following services, treatments, or supplies are not covered under the BHPHP:**

* * *

(4) Care and treatment that is either Experimental/Investigational or not Medically Necessary.

* * *

**Experimental and/or Investigational** means services, supplies, care and treatment which does not constitute accepted medical practice properly within the range of appropriate medical practice under the standards of the case and by the standards of a reasonably substantial, qualified, responsible, relevant segment of the medical community or government oversight agencies at the time services were rendered.

*The Plan Administrator must make an independent evaluation of the experimental/nonexperimental standings of specific technologies. The Plan Administrator shall be guided by a reasonable interpretation of BHPHP provisions.* The decisions shall be made in good faith and rendered following a detailed factual background investigation of the claim and the proposed treatment. The Plan Administrator will be guided by the following principles:

(1) The technology must be appropriate, in level of service and intensity, to the nature of the disease or condition being treated.

(2) Public policy would support the procedure(s) as a valid and ethical course of treatment.

(3) The technology is judged to be reasonably clinically effective according to reports in peer reviewed scientific literature, completed clinical study data and/or preponderant expert medical opinion.

If a technology does not meet the above criteria, in whole or in significant part, it will be deemed Experimental and/or Investigational. The decisions of the Plan

Administrator will be final and binding on the BHPHP.

Drugs are considered Experimental if they are not commercially available for purchase and/or they are not approved by the Food and Drug Administration for general use.

* * *

**Medically Necessary or Medical Necessity** means services or supplies provided by a provider facility or a provider individual, which are required for treatment of illness, Injury, diseased condition or impairment and are:

(1) Consistent with your diagnosis or symptoms;

(2) Appropriate treatment according to generally accepted standards of medical practice;

(3) Not provided only as a convenience to you or the provider;

(4) Not experimental or unproven; and

(5) Not excessive in scope, duration or intensity to provide safe, adequate and appropriate treatment to you. Any service or supply provided at a provider facility will not be considered Medically Necessary if your symptoms or condition indicate that it would be safe to provide the service or supply in a less comprehensive setting.

The fact that any particular provider individual may prescribe, order, recommend or approve a service, supply or level of care does not, of itself, make such treatment Medically Necessary or make the charge a covered charge under the BHPHP.

* * *

**Covered Charges**

Covered charges are the Usual, Customary and Reasonable charges that are incurred for the following items of service and supply. These charges are subject to the "Benefit Limits" of the BHPHP. A charge is incurred on the date that the service or supply is performed or furnished.

Def.App. F, Bush Decl. Ex. B at 11, 28, 32–33, 35–36 (emphasis added).

Neurological Resources concedes that the language regarding experimental or investigational services contains discretionary language. See Pl. Br. at 19, quoting Def.App. F, Bush Decl. Ex B at 32–33 ("The Plan Administrator must make an independent evaluation of the experimental/ nonexperimental standings of specific technologies. The Plan Administrator shall be guided by a reasonable interpretation of BHPHP provisions"). However, Neurological Resources points out that Anthem denied all the claims submitted under the Burns Harbor Plan (except for the one workrelated claim) on the ground that the procedures were not "medically necessary." The relevant language in this plan, therefore, is that dealing with medical necessity. Assuming that Neurological Resources' concession is correct (and the court expresses no opinion on that point), the discretionary language relating to experimental procedures does not extend any comparable discretion to the administrator in deciding whether procedures are "medically necessary." See *Pirozzi v. Blue Cross–Blue Shield of Virginia,* 741 F.Supp. 586, 589 (E.D.Va.1990) (applying *de novo* standard of review to administrator's decision to deny coverage based on experimental procedure exclusion that conferred no discretion on the administrator, even though "medically necessary" provision explicitly granted administrator discretion).

Anthem argues that plan provisions that the policy covers "medically necessary" supplies and services automatically give the administrator discretion such that the arbitrary and capricious standard of review applies. Anthem cites a number of cases in support of this argument. See *Anderson v. Blue Cross/Blue Shield of Alabama,* 907 F.2d 1072, 1076 (11th Cir.

1990) (concluding that administrator had discretion where plan gave administrator "the right to determine which services and supplies are medically necessary and therefore payable and to determine the amount to be paid as a 'reasonable and customary fee' to physicians performing a service to or a procedure on a member," but applying more stringent review because of insurer's profit motive); *Mattive v. Healthsource of Savannah, Inc.*, 893 F.Supp. 1559, 1565 (S.D.Ga.1995) (concluding that administrator had discretion where plan stated that " 'experimental or investigational procedures' as determined by the ... medical director are excluded," and that "experimental services" are procedures which are "in the judgment of the plan not recognized as conforming to accepted medical practice") (emphasis omitted); *Mann v. Prudential Insurance Co. of America*, 790 F.Supp. 1145, 1149, 1150 (S.D.Fla.1992) (concluding that administrator had discretion where plan provided that "unnecessary services and supplies are not covered").

The court does not agree with Anthem on this point. Neither *Anderson* nor *Mattive* actually supports Anthem's argument: plans in both cases contained language that specifically gave the medical director the discretion to determine which procedures were "medically necessary," or in the case of *Mattive*, which procedures were "experimental." Although no "magic words are required to confer discretion on an administrator," *Chojnacki*, 108 F.3d at 815, language that the plan merely covers "medically necessary" supplies and services is not sufficient to confer discretionary authority on the plan administrator to determine eligibility for benefits. Compare *Murzyn v. Amoco Corp.*, 925 F.Supp. 594, 598–99 & n. 1 (N.D.Ind.1995) (applying *de novo* standard of review where plan terms gave administrator authority to make decisions as to whether medical services are "medically necessary in terms of generally accepted medical standards" because terms did not give administrator the "general authority to construe and inter-pret provisions of the Plan"); *Cottle v. Metropolitan Life Insurance Co.*, No. 92 C 1452, 1995 WL 519958, *4–5 (N.D.Ill. Aug.30, 1995) (applying *de novo* standard of review where the plan stated that expenses would be excluded for "any days of hospital confinement or any medical services to the extent that these are not medically necessary in terms of generally accepted medical standards"); *Pirozzi v. Blue Cross–Blue Shield of Virginia*, 741 F.Supp. 586, 589 & n. 5 (E.D.Va.1990) (provision excluding coverage for "experimental or clinical investigative procedures; services of no scientifically proven medical value; also services not in accordance with generally accepted standards of medical practice," did not confer discretion on administrator; on the other hand, provision stating that "benefits will be denied if the Plan determines, in its sole discretion, that care is not Medically Necessary" did confer discretion on administrator), with *Sven v. Principal Mutual Life Insurance Co.*, No. 95 C 5232, 1996 WL 539109, at *4, *6 (N.D.Ill. Sept.20, 1996) (concluding that administrator had discretion to determine eligibility where plan stated that covered charges included "medically necessary care," which was defined as "any confinement, treatment, or service that is prescribed by a Physician and determined by the Company ... to be ... necessary and appropriate").

The "medical necessity" provision in the Burns Harbor Plan contains no language that extends to the administrator the power to exercise *discretionary* judgment. In fact, in the absence of language clearly indicating that the administrator has discretion to make eligibility determinations, the plan's thorough and detailed definition of medical necessity supports Neurological Resources's argument that the court should instead apply a *de novo* standard of review. Cf. *Loyola University of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 899 (7th Cir.1993) (applying arbitrary and capricious standard where plan "did not define the term 'experimental' at all," stated "as

determined by us," and contained other language that granted discretion to administrator). Therefore, the court will apply the *de novo* standard of review to the determinations made under the Burns Harbor Plan.

█ *The USS Program:* Anthem cites the following provisions in the USS Program to support its argument that this plan gives the plan administrator discretionary authority to determine eligibility:

### Examples of Expenses Not Covered Under Major Medical

- dental services, treatments and appliances;
- eyeglasses or contact lenses and examinations for the prescription or fitting thereof (except after cataract surgery);
- health check-ups and routine physical examinations;
- cosmetic surgery or treatment (except to correct damage caused by accident or injury while insured for this coverage);
- penalty payments imposed under certification and second surgical opinion provisions;
- 10% of a non-participating facility's or agency's charges;
- retail or mail order prescription drugs, including copayments;
- *physician fees in excess of UCR as determined by Blue Cross Blue Shield or in excess of reasonable and customary charges as determined by Blue Cross Blue Shield under Major Medical.*

* * *

### Covered Medical Expenses

The term "Covered Medical Expenses" means *the reasonable and customary charges, as determined by Blue Cross or Blue Shield,* incurred by you or one of your dependents for the following types of medical services, supplies, and treatments which are performed or prescribed *as necessary* by (i) a licensed physician, or (ii) a licensed podiatrist with respect to the services of a podiatrist for which benefits are payable under the Program.

* * *

*Expenses Not Covered*
The Following are not Covered Medical Expenses:

* * *

(1) *Services of any practitioner who is not legally licensed to practice medicine and surgery,* except to the extent specifically provided in the Program or as required by law; ...

Def.App. F, Bush Decl., Ex. C at 21, 80–81, 86–87 (emphasis added).

Anthem denied the claims asserted under the USS plan on the basis that the procedures were not medically necessary. Although the plan asserts that covered medical expenses include those that are "performed or prescribed *as necessary,*" as explained above, this language alone is not enough to confer discretion on the administrator. See, *e.g., Murzyn,* 925 F.Supp. at 598 n. 1.

Similarly, language such as "reasonable and customary charges as determined by Blue Cross Blue Shield" does not confer discretionary authority on the administrator to determine eligibility for insurance benefits. For instance, in *Cottle v. Metropolitan Life Ins. Co.,* No. 92 C 1452, 1995 WL 519958, *3–5 (N.D.Ill. Aug.30, 1995), the court found that the *de novo* standard of review applied where the plan contained the following language: "COVERED MEDICAL EXPENSES means reasonable, necessary, and customary expenses;" and the "Insurance Company will evaluate what constitutes a reasonable and customary fee." The district court explained that "None of the language cited by Metropolitan comes close to any of the language that the Seventh Circuit has found to confer

discretion on the plan fiduciary or administrator." *Id.* at \*4.

■ The language here is nearly identical to that in *Cottle* and does not give the administrator discretion such that the arbitrary and capricious standard of review should apply. Even if the terms of the plan might give Anthem some discretion in determining an *amount* to pay, it does not give Anthem discretion to determine *whether* to pay—the relevant issue here. A plan can give an administrator discretion in some areas but not in others. See, *e.g.*, *Pirozzi*, 741 F.Supp. at 589 & n. 5 (experimental procedure exclusion did not confer discretion on administrator, but medical necessity provision did). These benefit plans are contracts, and parties are free to bargain for more restrictive provisions. As the Supreme Court acknowledged in *Firestone:* "Neither general principles of trust law nor a concern for impartial decisionmaking, however, forecloses parties from agreeing upon a narrower standard of review." 489 U.S. at 115, 109 S.Ct. 948. A provision granting an administrator discretion to determine a reasonable amount simply does not give the administrator discretion to determine whether a claimant is eligible for benefits.

As for the third provision, setting forth that services of a non-licensed practitioner would not be covered, Neurological Resources argues that this language should not be controlling because Anthem did not deny any of the claims based on the fact that a physician was not licensed. Pl. Br. at 21. Anthem responds by stating only that "Anthem witnesses testified that determining whether the procedure was performed by a licensed physician helps dictate whether the claim is medically necessary." Def. Reply Br. at 11, citing Def.App. B, Claims Decl. 1–33, 35–52, ¶ 7. The court fails to see how plan language barring coverage for services provided by a non-licensed physician confers any amount of discretion on an administrator. Except for some exceptions identified in the plan, if a physician is not licensed, the expense will not be covered. This language does not explicitly or implicitly require any type of discretionary judgment call. Accordingly, the court will apply a *de novo* standard of review to the claims under the USS Plan.

■ *The National Salaried Program Plan:* Anthem cites two provisions in the National Salaried Program Plan to support its argument that this plan gives the plan administrator discretionary authority to determine eligibility:

**Covered Medical Expenses**

Covered Medical Expenses include the *usual and prevailing charges* for the following types of medically *necessary services,* supplies and treatments for which benefits are payable under the Plan:

\* \* \*

Expenses not covered:

\* \* \*

(m) *services of any practitioner who is not legally licensed to practice medicine and surgery,* except to the extent specifically provided in this Plan. . . .

Def.App. F, Bush Decl. Ex. E at 10, 12 (emphasis added).

As explained above in reference to the USS Plan, language stating merely that expenses will be covered for "necessary" services, that charges must be "usual and prevailing," and that the plan will not cover services by a non-licensed practitioner fails to confer discretion on the plan administrator. The court will apply a *de novo* standard of review to the claim denials made under the National Salaried Program Plan.

*The National Hourly Program Plan:* Anthem cites the following provisions in the National Hourly Program Plan to support its argument that this plan gives the plan administrator discretionary authority to determine eligibility:

**Covered Medical Expenses**

The term "Covered Medical Expenses" means the *reasonable and customary charges,* * as *determined by Blue Cross or Blue Shield,* incurred by you or one of your dependents for the following types of medical services, supplies, and treatments which are performed or prescribed *as necessary* by (i) a licensed physician, or (ii) a licensed podiatrist with respect to the services of a podiatrist for which benefits are payable under this Program:

* * *

**Expenses Not Covered**

The following are not Covered Medical Expenses:

* * *

(m) *Services of any practitioner who is not legally licensed to practice medicine and surgery,* except to the extent specifically provided in this Program or as required by law. If eligible, chiropractic visits limited to 30 per year....

* * *

Since the payment of your major medical claim depends upon your submitting the bills received by you for various types of Covered Medical Expenses, it is important that you keep a record of all such expenses and all bills, receipts, and other documents relating to them.

Def.App. F, Bush Decl. Ex. F at 80, 84–85, 87 (emphasis added).

These provisions are similar to those set forth in the USS Plan and the National Salaried Program Plan. Again, the references to practitioner licensure, "necessary" treatments, and "reasonable and customary charges as determined by Blue Cross or Blue Shield" are not enough to confer discretion on the administrator to determine benefit eligibility. The court will apply the *de novo* standard of review.

*The Tower Plan:* Anthem cites one provision in the Tower Plan to support its

argument that this plan gives the plan administrator discretionary authority to determine eligibility:

**Medical Necessity**

*A service that you receive from a medical provider must be medically necessary in order to be payable under your health care coverage.* The guidelines for determining medical necessity are specified in detail in Section 10, "Glossary— Health Care Terms."

Note: In some cases, you are required to pay for services **even when they are medically necessary.** These limited situations are:

• When you do not inform the hospital that you are Blue Cross Blue Shield member either at the time of admission or within 30 days after you are discharged

• When you fail to provide the hospital with information that identifies your coverage.

Def.App. F, Bush Decl. Ex. H at 12.

■ The language cited by Anthem from the Tower Plan does not confer any type of discretion on the administrator. As explained above, a plan provision that services must be "medically necessary" is simply not enough to overcome the presumption that the *de novo* standard of review should apply. See *Murzyn,* 925 F.Supp. at 598 n. 1; *Cottle,* 1995 WL 519958, at *4–5. Also, as Neurological Resources points out, the definition of medical necessity, which is presumably defined in the Glossary, is missing from the documents submitted by Anthem. In the absence of any language conferring discretion on the administrator, the court will apply the *de novo* standard of review pursuant to *Firestone,* 489 U.S. at 111, 109 S.Ct. 948.

*The Slater Program Plan:* Anthem cites the following provisions in the Slater Program Plan to support its argument that this plan gives the plan administrator discretionary authority to determine eligibility:

**Covered Medical Expenses**

The term "Covered Medical Expenses" means the *reasonable and customary charges, as determined by the Corporation,* incurred by you or one of your dependents for the following types of medical services, supplies, and treatments which are performed or prescribed *as necessary* by (i) a licensed physician, or (ii) a licensed podiatrist with respect to the services of a podiatrist for which benefits are payable under the Program:

\* \* \*

**Expenses Not Covered**

The following are not Covered Medical Expenses:

\* \* \*

(k) Services of any *practitioner who is not legally licensed* to practice medicine and surgery, except to the extent specifically provided in the Program or as required by law. . . .

Def.App. F, Bush Decl. Ex. I at 22, 25–26 (emphasis added).

Again, these provisions merely state that Anthem determines whether charges are "reasonable and customary," that services must be "necessary," and that services must be performed by a "licensed physician." As explained above, such language does not confer discretion on the administrator to determine benefit eligibility. The court will apply the *de novo* standard of review to the claims denied under the Slater Program Plan.

*The Four Seasons Plan and the Christian Miller Plan:* Anthem cites the following identical provisions in the Four Seasons Plan and the Christian Miller Plan to support its argument that these plans give the plan administrator discretionary authority to determine eligibility:

**Covered Charges**—Charges which are:

1. For *Medically Necessary services, supplies, care, or treatment;*

2. Due to Sickness or Injury;

3. Prescribed, performed, or ordered by a Physician;

4. *Reasonable and Customary Charges;*

5. Incurred while insured under this Group Policy; and

which do not exceed any maximum shown in the Schedule of Benefits.

\* \* \*

*Medically Necessary or Medical Necessity—Services or supplies received while insured that are determined by the Company to be:*

1. Appropriate and necessary for the symptoms, diagnosis, or direct care and treatment of the Insured's medical condition;

2. Within the standards the organized medical community deems good medical practice for the Insured's condition;

3. Not primarily for the convenience of the Insured, the Insured's Physician or another provider or person;

4. Not Experimental/Investigational or unproven, as recognized by the organized medical community, or which are used for any type of research program or protocol; and

5. Not excessive in scope, duration, or intensity to provide safe, adequate, and appropriate treatment.

Def.App. F, Mennonno Decl. Ex. A at 10, 15–16 (Four Seasons Plan) (emphasis added); Def.App. F, Mennonno Decl. Ex. B at 10, 15–16 (Christian Miller Plan).

As explained above, the provisions referring to "reasonable and customary charges" and "medically necessary services, supplies, care, or treatment" are not enough to confer discretion on an administrator. Moreover, the plans' detailed definition of "medical necessity" does not show that the "administrator has the power to construe uncertain terms or that eligibility

determinations are to be given deference." See *Firestone*, 489 U.S. at 111, 109 S.Ct. 948. This provision merely establishes that the company must make a determination as to eligibility. Under any health plan that does not require payment on demand, someone must make a decision to determine whether an expense is covered by the plan. That need for a decision does not, without more, imply that the person making that decision has been given authority to construe ambiguous or doubtful terms in the contract so that courts must defer to that person's legal interpretations of the contract or eligibility determinations. See discussion above at pages 849–51. Language like this simply does not rise to the level required by *Firestone* to overcome the presumption of *de novo* review. The court will apply the *de novo* standard to its review of these claims.

*The Trans–United Plan:* Anthem cites two provisions in the Trans–United Plan to support its argument that this plan gives the plan administrator discretionary authority to determine eligibility:

**Covered Charges**—Charges which are:

1. For *Medically Necessary services, supplies, care, or treatment;*

2. Due to Sickness or Injury;

3. Prescribed, performed, or ordered by a Physician;

4. *Reasonable and Customary Charges;*

5. Incurred while insured under this Group Policy; and

which do not exceed any maximum shown in the Schedule of Benefits.

\* \* \*

*Medically Necessary or Medical Necessity*—Services or supplies received while insured *that are determined by the Company to be:*

1. Appropriate and necessary for the symptoms, diagnosis, or direct care and treatment of the Subscriber's medical condition;

2. Within the standards the organized medical community deems good medical practice for the Subscriber's condition;

3. Not primarily for the convenience of the Subscriber, the Subscriber's Physician or another provider or person;

4. Not Experimental/Investigational or unproven, as recognized by the organized medical community, or which are used for any type of research program or protocol; and

5. Not excessive in scope, duration, or intensity to provide the safe, adequate, and appropriate treatment.

For Hospital stays, this means that acute care as an Inpatient is necessary due to the kinds of services the Subscriber is receiving or the severity of the Subscriber's condition, and that safe and adequate care cannot be received as an Outpatient or in a less intensified medical setting.

The fact that any particular Physician may prescribe, order, recommend, or approve a service, supply, or level of care does not, of itself, make such treatment Medically Necessary or make the charge a Covered Charge under this Group Policy.

Def.App. F, Mennonno Decl. Ex. C at 11, 16–17 (emphasis added).

These provisions are nearly identical to those in the Four Seasons Plan and the Christian Miller Plan. For the reasons stated above, the court will apply the *de novo* standard of review to claims under this plan.

*The NIPSCO Plan:* Anthem cites two provisions in the NIPSCO Plan to support its argument that this plan gives the plan administrator discretionary authority to determine eligibility:

"**Medical Necessity**" is a process in which determination that a resource expended in the treatment or evaluation of a disease is both appropriate and consis-

tent with the diagnosis that is known or suspected.

\* \* \*

EXCEPTIONS

The Plan does not cover "Expenses":

\* \* \*

(2) Which are not certified by the attending physician to be medically necessary.

\* \* \*

(16) Expenses which are experimental/investigative in nature in the area where the service is rendered. .

(17) Expenses incurred in excess of the reasonable or usual and customary charges.

Def. Aff. F., Slaughter Decl. Ex. F at A.7, A.13–A.14.

These provisions also do not confer discretion on the plan administrator. First, the definition of medical necessity does not contain any discretionary language. Moreover, the language regarding "reasonable or unusual and customary charges," even if phrased in discretionary terms (and it is not), would not confer discretion on the administrator to make *benefit eligibility* determinations. Finally, the provision regarding experimental services, even if phrased in discretionary terms (and it also is not), is irrelevant because all the claims under the NIPSCO plan were denied as not medically necessary. See Def.App. A at 7–8, 11–14. Accordingly, the court will review these claim denials under the *de novo* standard of review.

### Conclusion

For the reasons set forth above, defendant Anthem's motion for summary judgment is GRANTED with respect to all of plaintiff Neurological Resources' state law claims, for all of the claims arising under insurance policies and benefit plans with anti-assignment provisions, and for the one claim arising from a work-related injury. However, Anthem's motion for summary judgment is DENIED with respect to all of the remaining claims under the ERISA policies. These issues are addressed in detail with respect to the individual patients' files in the court's separate entry today.

So ordered.